UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA

V.

GHALEB ALAUMARY

Case no. 20-CR-00027
MOTION FOR REDUCTION
IN SENTENCE UNDER THE
PROVISION OF TITLE 18 U.S.C.
3582 (C)(1)(A)(i)

Now comes GHALEB ALAUMARY, by pro-se motion and affidavit in support of the motion requesting a sentence reduction and/or a modification of this defendant's term of imposed imprisonment under the Title and Provision of 18 U.S.C. 3582 (C)(1)(A)(i) defendant's extraordinary and compelling reasons have been set forth in the attached affidavit in support of the motion for reduction of sentence and the petitioner stongly believes it would be in the interest of justice, and the presentation of equal treatment towards all parties involved that this motion be granted in its entirety.

DATE: 08/17/2022

Respectfully submitted
by: _____
GHALEB ALAUMARY/72802-019
FCI FORT DIX
P.O. BOX 2000
JOINT BASE MDL
NJ 08640

## AFFIDAVIT IN SUPPORT OF MOTION FOR
## THE REDUCTION OF SENTENCE

This petitioner respectfully now presents to this Honorble Court, verifiable evidence of government overreaching, denial of equal protection of law and martime and territorial jurisdiction of the UNITED STATE's violations; as well as clear procedural and due-process violations, and ineffective assistance of counsel claims all directly associated with the investigation and prosecution of this case and matter.

Today, the petitioner presents arguments for faulty enhancements that the petitioner's counsel failed to address the Court on these implicable enhancements that total 9 points to the petitioner's sentencing guidelines. First, 2B1.1(b)(11)(c)i and 2B1.1(b)(11)(c)ii is not applicable to the petitioner. In the PSI, it clearly states that codefendants, Ohanaku and Desangles, provided and manufactured all of the false identifications that were provided to the confidential informant(CI). Therefore, the petitioner should not receive the two level enhancements.

The Government applied the wrong enhancement in the Georgia's indictment. It claimed that there were five or more participants, which resulted in a three level enhancement. 3B1.1)b) which is inapplicable, because there were only four defendants (Alaumary, Ohanaka, Desangles and Courson, the CI) in the indictment. The correct enhancement is 3B1.1(c), two levels instead of three.

2B1.1(b)(10)(A). This enhancement is inapplicable according to case (USA v. Morris,153 Fed.Appx.556), 11th Circuit, case binding, which states "Although the government presented evidence that defendant and the co-conspirators would go out of town to engage in credit card fraud, there was no evidence that any member tried to 'relocate' the scheme to another jurisdiction. The evidence implied an expansion of the conspiracy rather than a relocation."The CI had a round-trip ticket from Florida to Texas, which meant that the out-of-town trips were only temporary and that Mr. Courson alwyas returned to Florida.

In the petitioner's judgement, the government is asking a restitution of $5.5 million

1

to Bank Islami Pakistan Limited, $728,992 to VISA International Service Association and $6,091,299.26 to Bank of Valletta. The petitioner has attached evidence showing the prosecutor's wrongfully ordered and falsified restitution amounts of over $12,000,000.

All the preceeding amounts to a constructive denial of counsel which caused this defendant an unjust conviction for alleged criminal conduct, which was said to have occured on foreign lands and not in a district in which the Federal Government of the United States exercised exclusive legislation in all cases and violated the provision (not exceeding ten square miles) as stated in the UNITED STATES CONSTITUTION of Article 1 § 8c ()(17). The indictment alleges criminal acts committed entirely beyond the borders of the United States and the Government did not rely on any theory of territorial jurisdiction to support the petitioner's prosection for such offenses. "it is longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the the territorial jurisdiction of the United States "MORRISON, 130 S.CT. at 2822 (quoting EEOC V. ARABIAN AM. OIL CO. (ARAMCO)", 499 U.S. 244 248, 111 S. CT. 1227, 113L ed. 2d. 274 (1991) "(superceded by civil rights act of 1991, publ no. 102-166 105 1o5 stat 1071)" This principle represents a canon of construction or a presumption about a statutes meaning, rather than a limit upon Congress's power to legislate. It rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters. Therefore,, "unless there is the affirmative intention of Congress clearly expressed to give a statute extraterritorial effect, we must presume it is primarily concerned with domestic conditions, ARAMCO,499 U.S. at 248 petitioner urges the Court to follow the modern principle exemplified by MORRISON and insist that the government point to a textual basis in the statutes to support the extraterritorial reach of TITLE 18 U.S.C. 1956 (H) 18 U.S.C. 1956 (a)(1), 18 U.S.C.1956 (a)(1)(A)(i), 18 U.S.C. (A)(1)(B)(i) and 18 U.S.C. 1956 (A)(2)(B)(i) that would allow the Government to present alleged evidence of criminal conduct which occured in the alleged countries of CANADA, PAKISTAN, INDIA, MALTA and the UNITED KINGDOM, to be legally and lawfully characterized as offenses under TITLE 18 U.S.C. on review from the case file of UNITED STATES v. BOWMAN, 260 U.S. 94,98,43 S.CT. 39, 67 L.ed 149 (1922) THE SUPREME COURT reasoned the necessary locus for a crime when not specifically defined depends upon the purpose of Congress as evidence as evidence by the description and nature of the crime and upon the territorial limitations upon the power and jurisdictiion of a government to punish crime under the law of nations, the SUPREME COURT goes further on

to state crimes against private indivduals of their property like assault, murder, burglary, larceny, robbery, arson, embezzlement and frauds of all kinds, which effect the peace and good order of the community, must of course be committed within the territorial jurisdiction of the Government where it may properly exercise it. If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negate the purpose of Congress in the regard. The Merriam Webster Dictionary of Law defines over-reaching as conduct that exceeds established limits (as authority or due-process). The petitioner now presents extraordinary and compelling reasons which should, under the provisions of law, warrant a reduction of sentence, being that the petitioner's base offense level calculation whould not have included foreigh alleged criminal conduct which were not a crime against the UNITED STATES. Congress, while it has not remained entirely silent, has chosen to assign to foreign crimes a rather limited role; there are good reasons to avoid creating a new use for foreign crimes in sentencing; to do so would require distinguishing between activities that violate both domestic and foreign law and those which violate only one. The petitioner now states that without a clear mandate from Congress, this Court should have declined to create the complexities that the inclusion of foreign crimes in the base offense level calculation generated in this case. The petitioner contends that the district court erred in departing upward 22 levels on his base offense level for criminal conduct alleged to have occuredl in "CANADA, INDIA, MALTA and the UNITED KINGDOM and amounted $53,769,815.28 dollars of foreign conduct, leaving the government only $3,561,780.63 of domestic conduct to consider in determining this petitioner's base offense level. In the case of the UNITED STATES v. AZEEM, 946 F.2d 13-16, (2nd cir.1991), the Second Circuit held that the Egyptian Transaction should not have been included in the base offense level calcuation because it was not a crime against the United States. The consideration given in AZEEM with respect to the petitioner's base offense level should guide this Court when deciding the motion for a reduction in sentence in this case. The petitioner further states that after review, the foreign conduct considered to be relevant, he uncovered factual evidence that the Government misrepresented the actual money amounts alleged to have been suffered. Please review the BANKISLAMI official statement, which shows an alleged loss of R.S. 2-6 million whihc is the equivalent of $19,500 U.S. dollars. BANKISLAMI has confirmed that its total loss was only $19,500 and 6.5 million. Absent reliable information of uncharged foreign criminal conduct, the additional 22 points on the petitioner's base level should not have been levied; the Government could not prove any foreseeable loss that

3

exceeded more than $25,000,000. There was no appropriate foundation for an upward departure under 2B1.1(L) nor is there any foundation for an upward departure under the first four subdivisions of 4A1.3. The only other express possibility for raising the petitioner's base level offense is under the fifth subdivision of subsection (E) which suggests that the count might consider "reliable information" about prior, similar adult criminal conduct not resulting in a criminal conviction (see U.S.S.C. 4A1.3(E). Assuming that subsection (E) might reasonably be extended to include alleged criminal conduct in a foreign country, petitioner is presenting evidence to this Court today showing that the information relied upon was in fact unreliable. If the United States has suffered no effect as a result, the petitioner urges this Court to consider the Government's testimony about "exceeded money amount's" said to been obtained in foreign countries as nothing more than hearsay. The petitioner is now requesting that the Court revist his base offense status for its clear inclusion of fake and false infromation as by the petitioner's attached documents. It is in the interest of justice and equal and fair treatment under the law that unreliable foreign criminal conduct bne removed from the calcuslations of the petitioner's base level offense. The petitioner also requests that the district court consider all above issues as extraordinary and compelling reasons that warrant a reduction or modification of the imposed term of imprisonment.

Based on the arguments, two of the enhancements should not be applied which are, 2B1.1(b)(11)(c); or 2B1.1(b)(11)(c)ii and 2B1.1(b)(10)(A), leaving the remaining to be adjusted from 3B1.1(b) to 3B1.1(c) and the corrected loss dollar amount. Instead of 2B1.1(b)(1)(L), $25,000,000 to $65,000,000, it should be 2B1.1(b)(1)(J), $3.5 million to $9.5 million. The petitioner's counsel failed to present to the courts that all of the foreign conduct (see exhibit 3,4) were never conspired, attempted or committed, against the United States of America (see exhibits 1 and 2).

In summary, the petitioner is rightfully seeking a total of 9 point reduction from his sentencing guidelines, reducing the level to 25 (57-71 months) from level 34.

I respectfully ask that this honorable Court grant me a reduction of sentence.
Respectfully submitted by:

---

Ghaleb Alaumary/72802-019
FCI Fort Dix Camp
P.O. Box 2000
Joint Base MDL, NJ 08640

I Ghaleb Alaumary, herby certify that I have sent a true copy of the forgoing via prepaid first class mail to the following AUSA: Christopher Howard

Add: 22 Barnard St, Ste 300, Savannah, GA, 31401

Signature: _____  Date: 08/17/2022

TRULINCS 72802019 - ALAUMARY, GHALEB - Unit: FTD-V-A

---

FROM: Alaumary, Bahjat
TO: 72802019
SUBJECT: Habeas Corpus and Section 2255 Proceedings
DATE: 07/31/2022 11:51:09 AM

Second: Regarding actual losses by the Pakistani Bank and links to proofs
The Bankislami has confirmed that his total loss amounted to US$19,500 and not 6.5M$ as was reported by the news agencies. The attached copies of an official BankIslami letters confirm that. ( 2 attachments)

https://www.zdnet.com/article/pakistani-bank-denies-losing-6-million-in-countrys-biggest-cyber-attack/

https://www.scribd.com/document/391889989/Bank-Islami-Statement

https://twitter.com/BankIslamiHR/status/1056648252421013508
BankIslami
BankIslami Pakistan Limited 11th Floor, Executive Tower, Dolmen City, Marine Drive, Block-4, Clifton, Karachi.
Tel: (92-21) 1 1 1-247(BIP)- I I I
Fox: 35378373
www.bankislami.com.pi<
October 28, 2018

The General Manager
Pakistan Stock Exchange Limited Stock Exchange Building
Stock Exchange Road Karachi

Dear Sir,

Our Ref: 100.2.311      MSH:SKS

Subject: Material Information: Cyber Attack on Debit Cards

In accordance with Section 96 of the Securities Act, 2015 and Clause 5.6.l(a) of PSX Regulations, we hereby convey the following information:

This is to inform that on the morning of October 27, 2018 certain abnormal transactions valuing Rs.2_6 million were detected by the Bank on one of its international payment card scheme. The Bank immediately took precautionary steps which, interalia, included shutting its international payment scheme. All monies withdrawn from the accounts i.e. Rs.2.6 million have been credited in the respective accounts of valued customers.

Subsequently, after the Bank was cut off from the international payment scheme, the Bank was advised by international payment scheme that some transactions were made on international ATM's allegedly using Bank's issued cards. However, no details have so far been shared with the Bank as to how such transactions were processed and validated when such transactions never landed on Bank's system. These transactions, of approximately USO 6 million as claimed by international payment scheme, are not acknowledged by the Bank as the Bank was actually logged off from the international payment scheme at that time.

The Bank is of the view that it was a co-ordinated cyber attack in which the payment network of the international payment scheme as well as that of the acquiring banks were possibly compromised. We have initiated consultations with information security experts. The State Bank of Pakistan has been advised accordingly.

Please be advised that all domestic ATM cash withdrawal transactions using Bank's Biometric service have been restored on the same day. However, as a precautionary measure, all transactions routing through international payment scheme will be shortly restored once the Bank is confident that all risks of unauthorized transactions have been mitigated.

Alhamdulillah, there is absolutely no threat as to continuing operations of the Bank. Any further details as and when they

TRULINCS 72802019 - ALAUMARY, GHALEB - Unit: FTD-V-A

---

FROM: Alaumary, Bahjat
TO: 72802019
SUBJECT: Habeas Corpus and Section 2255 Proceedings
DATE: 07/31/2022 11:51:09 AM

First: Regarding zero losses declared by the Bank of Valletta and links: >
Press release
Bank of Valletta fully recovered ALL the 13M euros hack confirmed that 10M euros of the approximate 13M euros fraud were reversed before even leaving the bank and the balance of approx. 2.9M euros were located in a Hong Kong Bank and were also recovered by the Bank read this link: http://www.independent.com.mt/articles/2019-05-09/local-news/Remaining-2-9-million-stolen-in-BOV-cyber-attack-found-in-Hong-Kong-6736207900
And:
https://www.pressreader.com/malta/malta-independent/20190510/281496457724022

Remaining 2.9 million stolen in BOV cyber attack found in Hong Kong
Albert GaleaThursday, 9 May 2019, 18:17Last update: about 4 years ago
Legal proceedings underway to recover money/Bank of Valletta declares 71.2 million profit for 2018 financial year
The remaining 2.9 million which was stolen in a cyber attack on Bank of Valletta last February has been found in Hong Kong, and the bank's lawyers are opening legal proceedings in that country to recover the money, Bank of Valletta chairman Taddeo Scerri said at the bank's annual general meeting.
Around 13 million was stolen from BOV last February after a cyber attack hit the bank, forcing it to shut down its entire grid. The bank came back online the following day, and since then 10 million of that which was stolen has been recovered.
While the cyber attack was not brought up during the speeches of Scerri and of CEO Mario Mallia, questioned by bank shareholders, Scerri revealed that the remaining 2.9 million which had been stolen has been located and every effort was being made to recover it.
Scerri told shareholders that had it not been for the immediate response of BOV staff to decide to immediately cease all overseas transactions, the attackers would have stolen much more than 13 million.
He said that the bank has brought in global experts to help strengthen the bank's IT and security infrastructure while an IT Overview Committee was also set up to oversee this process. Scerri assured that the bank is today in a position where it can meet and beat back similar attacks.
In his speech, Mallia spoke of how the bank was going to have a more restricted risk appetite in the coming year, and said that it would be closing trusts and custody while also ending their relationship with thousands of customers which are over the said risk appetite. He said that the bank would no longer be considering clients with no connection to Malta.
The bank declared a profit of 71.2 million after taking into account its litigation provision. The total profit prior to the litigation provision being taken into consideration was that of 146.2 million, which was equivalent to a 9.9% return on equity significantly higher than the 7.3% average registered by banks in the Eurozone.
Client deposits rose by 314 million, equivalent to 3.1%, to a total of 10.4 billion while the bank's assets rose by 326 million, meaning that these assets now stand at 12 billion. The bank's total equity currently stands at 994 million.
Mallia described the year as one of growth despite a number of challenges which were faced.
"We experienced a sustained request for lending, especially in the mortgages sector with a number of business areas, including investment services, credit cards and payments registering substantial growth," he said.
"Priority will continue to be given to the conservation and strengthening of the Group's Capital," Scerri meanwhile said. 'The Bank will emphasise on long-term sustainability and stability hence the Board of Director's decision not to pay a cash dividend this year.. Nonetheless shareholders will benefit from a bonus share issue of 1 new share for every 10 shares held for a total value exceeding 53 million at current market price', he said.
Shareholders voted in favour of the release of these bonus shares, which means that the bank's capital will go up from 530 million to 583 million.
No election of Directors was held during the Annual General Meeting, meaning that the Bank's board of directors is composed of Taddeo Scerri as Chairman, Stephen Agius, Paul V. Azzopardi, Miguel Borg, James Grech, Alfred Lupi, Mario Mallia, Anita Mangion, Antonio Piras, and Joseph M. Zrinzo.

Conduct of United States of America | Foreign Conduct

| Victim's name | Actual loss | Intended loss | Victim's name | Actual loss | Intended loss |
|---|---|---|---|---|---|
| Victim A | $0.00 | $216,000.00 | McEwen University Canada | $1,021,570.12 | $11,822,000.00 |
| Victim B | $0.00 | $900,000.00 | BankIslami Pakistan Limited | $19,500.00 | $6,122,173.08 |
| Mandavee Enterprise LLC | $13,966.00 | $522,747.66 | Indian Bank Cosmo | $16,307,642.20 | $16,307,642.20 |
| Implus Footcare LLC | $59,000.00 | $1,170,175.21 | Bank of Valletta | $0.00 | $14,700,000.00 |
| Law Firm | $922,857.76 | $922,857.76 | English Premier League Club | $0.00 | $7,740,000.00 |
| Total | $995,823.76 | $3,715,780.63 | Total | $17,348,712.32 | $56,691,815.36 |

EXHIBIT 3

EXHIBIT 4

McEwen / TD Canada
- $22K
- $9.9M
→ Dubai: $469K
→ Hong Kong: $3.4M
→ China: $3.8M

Bank Islami Pakistan — ATM Withdraws — $19,500 Pakistan

India Bank Cosmo — ATM Withdraws — $10M China, India, Russia, Canada, Europe, Indonesia

Bank of Valletta
- $500K Bulgaria
- $500K Romania
- $1.3M London
- $2.9M Hong Kong

London Premier Soccer & Company — Mexico — Mexico

TRULINCS 72802019 - ALAUMARY, GHALEB - Unit: FTD-V-A

---

FROM: Alaumary, Bahjat
TO: 72802019
SUBJECT: US dept of justice press release
DATE: 06/18/2022 08:51:04 AM

U.S. Attorneys » Southern District of Georgia » News
SHARE
Department of Justice
U.S. Attorney's Office
Southern District of Georgia
FOR IMMEDIATE RELEASE
Tuesday, February 2, 2021
Georgia man sentenced after admitting fraud in attempt to sell 50 million non-existent N-95 face masks to foreign government
U.S. Secret Service lauded for stopping $317 million scheme
SAVANNAH, GA:  A Georgia man has been sentenced after admitting he attempted to sell 50 million non-existent facemasks to a foreign government.

Paul Penn, 64, of Johns Creek, Ga., was sentenced to five months and 29 days of home confinement by U.S. District Court Judge R. Stan Baker after pleading guilty to Conspiracy to Commit Wire Fraud, said Bobby L. Christine, U.S. Attorney for the Southern District of Georgia. Judge Baker also fined Penn $1,500 and ordered him to serve three years of probation.

"If not for the vigilance of the U.S. Secret Service, Paul Penn and his co-conspirators likely would have lit the fuse on an international scandal by ripping off a friendly foreign government for more than $300 million," said U.S. Attorney Christine. "Instead, they halted the scheme before the criminals got a dime, and prevented these crooks from profiting from pandemic fear."

As described in court documents and testimony, Penn, through his company, Spectrum Global Holdings, LLC, agreed with unnamed co-conspirators to act as a middleman in the attempted sale of 50 million 3M Model 1860 Respirator Masks that he and his co-conspirators did not actually possess. Under the deal, Penn was to broker the sale in exchange for a cut of the $317 million sales price, which was more than 500 percent higher than the previous normal market value for N-95 masks.

Based on representations from Penn and others, the buyer, a foreign government, wired the funds to complete the purchase, which was disrupted by the U.S. Secret Service just before the transaction could be completed. All of the funds were returned to the foreign government.

"This case should serve as a strong deterrent to those considering exploiting the COVID-19 pandemic to enrich themselves through fraud. The nation's citizens, businesses and our international partners are counting on the U.S. Secret Service and its federal law enforcement and private sector partners to safeguard it and maintain the public trust," said Glen M. Kessler, Resident Agent in Charge of the Secret Service Savannah Office. "Tackling the threat of cyber-enabled COVID-19 scams requires an immediate response to safeguard our nation during these unprecedented times."

Please report COVID-19 fraud, hoarding or price-gouging to the National Center for Disaster Fraud's National Hotline at (866) 720-5721, or go to justice.gov/disastercomplaintform.

U.S. Attorney Christine acclaimed the hard work of the investigatory team, led by the U.S. Secret Service, for disrupting the scheme.

The case was prosecuted for the United States by the U.S. Attorney's Office for the Southern District of Georgia.

Topic(s):
Coronavirus
Financial Fraud
Component(s):
USAO - Georgia, Southern
Contact:
Barry L. Paschal, Public Affairs Officer: 912-652-4422
Press Release Number:
12-21

Ghaleb Alaumary 72802-019
FCI Fort Dix
Federal Correctional Institution
PO Box 2000
Joint Base MDL, NJ, 08640

Clerk of the Court
124 Barnard St
Savannah GA, 31401